**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **Emily Green and Jason Green, on behalf of a minor child A.G.,**<br>　　　　**Plaintiffs,**<br><br>**vs.**<br><br>**Winona Montgomery Consolidated School District,**<br>　　　　**Defendant.** | ) **CIVIL DIVISION**<br>) **CASE No.:**　4:21cv32-DMB-JMV<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

COME NOW Plaintiffs, Emily Green (hereinafter referred to as "Emily") and Jason Green (hereinafter referred to as "Jason") on behalf of their minor daughter A.G. (collectively referred to as "Plaintiffs") and file this action for violation of § 504 of the Rehabilitation Act of 1973 ("RA") and Title II of the Americans with Disabilities Act of 1990 ("ADA") against Winona Montgomery Consolidated School District ("WMCSD" or "Defendant"). In COUNT I, Plaintiffs on behalf of A.G. seek damages, declaratory and injunctive relief, and attorneys' fees and costs against Defendant for discrimination based on A.G.'s disability pursuant to the RA. In COUNT II, Plaintiffs on behalf of A.G. seek declaratory and injunctive relief, and attorneys' fees and costs against Defendant for discriminating against A.G. based on her disability pursuant to Title II of the ADA. In COUNT III, Plaintiffs on behalf of A.G. seek damages, declaratory and injunctive relief, and attorneys' fees and costs against Defendant for retaliating against A.G. because of her disability pursuant to RA. In COUNT IV, Plaintiffs for themselves seek injunctive and declaratory relief, and attorneys' fees and costs against Defendant for retaliating against them because of A.G.'s disability pursuant to Title II of the ADA.

## INTRODUCTION

1. Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 394 (Sept. 26, 1973), codified at 29 U.S.C. § 701 et seq. is an anti-discrimination mandate that applies to public school districts that receive any public funding. It prohibits a public school receiving federal funds from, among other things, denying a qualified person with a disability the opportunity to participate in or benefit from a benefit or service; affording a person with a disability a benefit or service that is unequal to that afforded to others; providing a person with a disability a benefit or service that is not as effective as that provided to others; or, limiting a person with a disability in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving an aid, benefit, or service.  34 C.F.R. § 104.4(b).

2. A. G. benefits from this protection against discrimination because she is a person with a physical or mental impairment that substantially limits a major life activity.

3. School Districts must make reasonable modifications to policies, practices, or procedures when necessary to ensure equal opportunity, unless the public school can prove that the modification would constitute a fundamental alteration of the nature of the activity.

4. Congress passed the ADA in part because "historically, society has tended to isolate and segregate individuals with disabilities, and such forms of discrimination ... continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress found that this discrimination included "segregation and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(a)(5).

5. As the result of Defendant's conduct, and with Congress' protection of the civil rights of people with disabilities, Plaintiffs plead their Complaint to this Court.

**JURISDICTION, PARTIES, VENUE, AND ARTICLE III STANDING**

6.  Jurisdiction is proper under 28 U.S.C §§ 1331 and 1343 because this is a civil action seeking redress for the deprivation of rights secured by federal law, specifically, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 et seq., Section 504 of the Rehabilitation Act of 1973, 42 U.S.C. §794(a), and 42 U.S.C § 1983.

7.  Venue is proper in this Court, the United States District Court for the Northern District of Mississippi, in that the complained of actions took place in, and the parties reside in, Montgomery County, Mississippi.

8.  Emily and Jason live in Montgomery County with A.G., are A. G.'s parents, are over eighteen years old, and are otherwise *sui juris*.

9.  A.G. is an eight-year-old daughter of Emily and Jason, who resides in Montgomery County, Mississippi and attends elementary school in a school operated by Defendant.

10. Defendant is located in Montgomery County, Mississippi, is a public school district organized under the laws of the State of Mississippi and is a recipient of state and federal financial assistance.

**FACTUAL ALLEGATIONS**

11. A.G. is a child with cerebral palsy, Attention Deficit Hyperactivity Disorder ("ADHD"), Anxiety and Mood Instability Disorder, and attends Winona Elementary School and has attended this school for the entire 2020-2021 school year.

12. A.G. is a student with a physical or mental impairment that substantially limits one or more major life activities. She has balance, gait, range of motion, and mobility issues related to her disability. She is also treated for anxiety and mood instability disorder which appears

to be exacerbated by fear and intimidating situations in her environment. She also has attention and concentration problems.

13. Defendant is a public entity in that it is a public school district and a provider of education and related services, employs principals, assistant principals, teachers, paraprofessionals, staff, contractors and other employees, who are Defendant's employees or agents, and whose actions are attributed to Defendant.

14. Defendant evaluated A.G. for special education services and determined that she has an orthopedic impairment, and thus, she receives special education services.

15. All of the school administrators and relevant personnel are aware of A.G.'s limitations relating to her impairment.

16. Plaintiffs describe below that Defendant has made numerous efforts to prohibit A.G. from freely using her walker as intended throughout the school facility, including the restroom, playground and classrooms, despite letters from A.G.'s treating physicians of the detrimental consequences of A. G. not being allowed to use her mobility devices.

17. Plaintiffs notified Defendant about A.G.'s pending bilateral femoral de-rotation osteotomy surgery in the Spring of 2020. There was extensive follow up correspondence between the Plaintiffs and Defendant regarding the wheelchair lift on the bus, accessibility issues, training for staff on A.G.'s needs related to her surgery and recovery, and other related issues.

18. On or about July 14, 2020, A. G. underwent bilateral femoral de-rotation osteotomy surgery. As the result of this hip surgery, A.G. was ordered by her surgeon not to have any weight bearing for several months and to use a wheelchair for mobility during the first part of the semester until her recovery had reached the point where she could gradually begin

to transition toward using a walker.

19. On or about August 5, 2020, Emily and Jason trained the school nurse and the assistant how to safely and properly lift A.G. from the wheelchair and transfer her onto the toilet. The student restroom was inaccessible to A.G., so A.G. used another restroom in a different school building.

20. Plaintiffs repeatedly discussed with Defendant the inaccessibility of the restrooms with or without A.G. using the wheelchair or another aid for mobility.

21. On or about August 7, 2020, Special Education Director Rana Mitchell stated to Emily and Jason that A.G. would not be allowed to come back to school until Defendant spoke with A.G.'s medical doctors.

22. On or about August 10, 2020, which was the first day of school, the special transportation bus assigned to pick up A.G. from home did not arrive and the parents had to take A.G. to school.

23. On or about August 10, 2020, when Emily and Jason, along with their four-year-old son, transported A.G. to school, Defendant gave them a list of questions for A.G.'s medical doctors with a requirement that the responses be completed and returned the same day. Defendant requested the parents to stay at the school until the doctors returned the answers. Plaintiffs were at the school for approximately four (4) hours.

24. On or about August 10, 2020, A.G. did not receive her sack lunch at the end of the day for the next school day because the special education bus left early, and the cafeteria workers had not set up the tables to pass out the lunches yet. The nondisabled peers received their lunches but A.G. and other students with disabilities did not.

25. Since August 10, 2020, Emily has been keeping a bus log showing A.G. is being picked

up at home at a time that would have her arriving at school later than her nondisabled peers are scheduled to arrive and leaving school earlier than her nondisabled peers by approximately twenty (20) minutes each day, resulting in her missing all or part of her breakfast in the morning and missing announcements and class time in the afternoon, because the bus leaves the school before the school day ends.

26.     On or about August 11, 2020, Emily wrote a letter to the Superintendent regarding the special education bus schedule issues and received a reply on or about August 13, 2020.

27.     On or about August 28, 2020, A.G.'s medical doctor wrote a prescription for Physical Therapy for Range of Motion, Gait Training, and Strength, weight bearing only as tolerated by A.G.

28.     On or about August 28, 2020, Defendant unilaterally decided A.G. did not need the use of a wheelchair, requiring it to be left at Defendant's office. A. G. started using the walker instead. A.G. told Emily after the fact that Defendant was requiring her to leave the wheelchair at the office.

29.     On or about August 31, 2020, after Emily found out Defendant was using a walker, thereby, requiring ankle and foot orthoses ("AFOs"), A.G. started wearing AFOs to school.

30.     On or about September 1, 2020, A.G.'s physical therapist Courtney Swedenburg asked Emily to request A.G.'s medical doctor to extend A.G.'s use of the wheelchair through Thanksgiving Break, 2020.

31.     On September 2, 2020, School nurse Ms. Pitt sent A.G. home alleging A.G. was sick. A.G. was not sick.

32.     On or about September 11, 2020, Emily filed a complaint with the Office of Civil Rights, ("OCR"), U. S. Department of Education alleging inaccessible restrooms for A.G., the

issues with the contracted bus schedule for the special education bus, and inaccessible handicap parking, where the sidewalks are inaccessible, are uneven and in disrepair, and where Defendant allows nondisabled individuals to be parked in the "handicap" spaces. [1]

33.     On or about September 11, 2020, Emily sent a letter to the Superintendent notifying him of the filed OCR Complaint.

34.     On or about September 14, 2020, the special transportation bus was inoperable, causing Plaintiffs to drive A.G. to school and to pick her up. Emily arrived at the school at 7:20 a.m. When Emily tried to pull into the circle drive which is used by the buses, the Resource Officer pointed his fingers, shook his head, and told Plaintiff she could not pull into the circle drive until after 7:40 a.m. Emily explained the situation, stating that A.G. is a child with a disability who uses mobility devices. The circle drive has no architectural barriers and is immediately adjacent to the front entrance. Emily explained that the special transportation bus was being serviced, and Plaintiff was trying to get A.G. into school in time for breakfast. The Resource Officer would not allow Emily to pull into the circle drive until after 7:40, which would have caused A.G. to miss all or part of her breakfast. Plaintiffs proceeded to the car rider line. Non-disabled car riders disembark and load at a location adjacent to a school entrance, which is accessed via a covered sidewalk. Because the car rider pick-up/drop off location is separated from the school entrance by concrete barriers, without a curb ramp or a ramp, it is inaccessible to car riders with disabilities. The designated "accessible" parking spaces in the parking lot for car riders are not located near the area where non-disabled peers disembark and load. The "accessible" parking spaces

_____

[1] As of March 11, 2021, the OCR complaint is pending.

and sidewalk curb ramps are not located on the shortest distance from the entrance to the school. The adjacent sidewalk is not covered by an awning to protect people with disabilities from the weather. The car rider line blocks the first accessible parking space, making it impossible for the car driver to depart in a timely manner when there is a long car rider line. On this date, Emily and A.G. waited through the car rider line, parked on the opposite side of the building in the second designated accessible parking space, which has a cut-out ramp in the curb. The sidewalk is uneven, cracked, and poses a danger to A.G. and other similarly situated individuals using a wheelchair or a walker. Emily was forced to push A.G. in her wheelchair a considerable distance around the building to gain entrance to the school.

35.    Nikita Smith, Assistant Principal, told Emily through email to pick up A.G. on that date (September 14, 2020) at 2:40 p.m. in the car rider lot, 10 minutes before car rider dismissal. Because the car rider drop-off/pick up location is inaccessible to Plaintiffs and other similarly situated individuals with disabilities, Defendant's solution has been to truncate the school schedule for students with disabilities, rather than remedy the architectural barriers, which would provide people with disabilities comparable access to the school entrance.

36.    On or about October 27, 2020, the OCR informed Defendant that as the result of a complaint filed by Plaintiffs, a complaint investigation had been opened regarding the lack of accessible restrooms and other architectural barriers at A.G.'s school plus the truncated school and bus schedule for students with disabilities.

37.  On or about October 27, 2020, school nurse Ms. Pitt sent A.G. home at 12:29 PM because of A.G.'s 99.1 temperature, sore throat and a stomachache. Emily and Jason took A.G. to the doctor on the same day, and there were no symptoms of any illness found.

38.  After October 27, 2020, when the OCR investigation was opened, teacher Ms. Bennett stopped making ~~the~~ supplemental assignments through iReady for A.G. The supplemental assignments were initially implemented at Emily 's request to help A.G. with two failing classes.

39.  On or about October 28, 2020, Jason approached the bus in the morning to assist A.G. with wheelchair management, as is Jason's customary routine, and to speak to the bus driver outside the bus regarding late arrival at and early departure from school of the special education bus.

40.  On or about October 29, 2020, Defendant attempted to circumvent their obligations under § 504 and the ADA by unilaterally deciding to take away A.G.'s walker in the restroom. These coordinated actions by Defendant demonstrate an intent to deprive A.G. of her dignity, her mobility, as well as her equal participation in Defendant's educational services.

41.  On October 30, 2020, Plaintiffs discovered Defendant's intention to remove A. G.'s walker in the restroom. A.G. indicated to Emily that the teacher began asking her at every restroom break if she wanted to go into the restroom without her walker. A.G. consistently told the staff she wanted to use her walker. A.G. also told the teacher the repeated inquiries made her feel "weird." The teacher told A.G. she was required to ask A.G. during every restroom break if she wanted to go into the restroom without her walker.

42.  On or about November 2, 2020, Plaintiffs indicated to Defendant they disagreed with Defendant's decision to take away A.G.'s walker in the restroom.

**43.**   On or about November 4, 2020, Plaintiffs received a letter from Superintendent Teresa Jackson stating that Jason's approaching the bus on October 28, 2020 violated Mississippi Code 37-41-2, threatening Jason to be arrested if he "interferes" with bus loading and unloading again.

42.   On or about November 5, 2020, A.G.'s treating physician sent a first letter to Defendant stating that A.G. should be allowed to use her walker until she is confident she can do so without it.

43.   On November 12, 2020, Assistant Principal Stacey Johnson rode a school bus to deliver a letter to Plaintiffs. Mr. Johnson refused to state what the letter was about, and Jason refused to accept the letter, requesting it to be sent via normal means or enclosed in A.G.'s backpack, which before this incident, was Defendant's usual practice.

44.   On November 13, 2020, school resource officers ("SRO") Mac Burrell and Britt Goodin arrived at Plaintiffs' home address in full police officer uniform in a marked police car, banged on the Plaintiffs' door, then left a letter on Plaintiffs' residence door, asking Plaintiffs to continue bringing A.G. to the lift and retrieving A.G. from the lift. Included in the letter was a list of the bus procedures from the student handbook. The outside of the envelope was marked: "Delivered: 11/13/2020 @ _____ AM/PM By: Mac Burrell, WSS SRO, Britt Goodin, WES SRO."

45.   On or about November 30, 2020, A.G. stopped bringing her wheelchair to school.

46.   On or about December 4, 2020, over Plaintiffs' objection, Defendant again refused to allow A. G. to use her walker in the inaccessible restroom.

47.   On or about December 10, 2020, A.G.'s treating physician sent a second letter to Defendant asking Defendant to allow A.G. to use her walker in the restroom, stating "generally, a

patient is safe to mobilize in an open environment once they can independently ambulate 200 feet without assistance." Plaintiffs considered A.G. to still be a fall risk.

48.     On or about December 12, 2020, a bus driver left A.G. at the end of the driveway alone at her home, without making sure A.G. was correctly situated in her walker and a parent was present. Based on the School's bus schedule, posted on their website, the bus should load at the school at 3:00 p.m. With a 22-minute drive, and A.G. being the last of approximately 5-7 students with disabilities to disembark, Plaintiffs would reasonably expect the bus to arrive no sooner than 3:30 p.m. Plaintiffs did not realize the bus had already dropped A.G. off at 3:05 p.m.

49.     On or about December 16, 2020, Emily sent an email to the Transportation Director, Charlie Parkerson, about this incident, indicating it was a danger for the bus driver to leave A.G. at the street unattended and to drive off without making sure A.G. had been intercepted by a responsible party.

50.     On or about December 18, 2020, an email response from Charlie Parkerson to the Plaintiffs indicated that bus arrival times are unpredictable, and the Plaintiffs should continue to meet the bus at the street. Prior to the OCR Complaint, the bus picked up and dropped off A.G. in her driveway.

51.     On or about January 5, 2021, A.G.'s psychiatrist wrote a letter to Defendant stating that "A.G.'s inadequate access to a handicapped bathroom is worsening her anxiety in particular. The stress is interfering with her ability to learn. It seems straightforward to me that reasonable accommodations should include an appropriate bathroom."

52.     On or about January 5, 2021, Plaintiffs asked teacher Ms. Bennett, at a virtual tutoring session, whether Ms. Bennett knew that A.G. had gotten upset in class due to Ms. Bennett's

constantly asking A.G. if she wanted to go to the restroom without her walker. Ms. Bennett refused to talk about the incident, stating Plaintiffs could hang up or continue tutoring.

53. On or about January 6, 2021, Ms. Bennett stopped providing tutorial instruction to A.G.

54. On or about January 6, 2021, A.G. stayed at home because of her anxiety related to the inaccessible restroom and Defendant's staff constantly confronting her about her disability, her medical equipment and reasonable accommodations.

55. On or about January 7, 2021, Ms. Bennett placed a sticker on the board for A.G. to collect if she went to the restroom without her walker. The sticker is placed on the board only for A.G. and stays on the board at all times and is encouraged to be placed on A.G.'s shirt as a reward for not using a walker. None of A.G.'s peers have had a sticker placed for them on the board. Because A.G. requires her walker for mobility, she never collected this sticker from the board.

56. On or about January 12, 2021, A.G. notified Plaintiffs that she is not allowed to walk into classroom with her walker or keep it in the classroom. Defendant told A.G. she had to leave her walker outside the second-grade pod. Emily wrote a letter to Defendant's teacher advising that A. G. should be allowed to use her walker in the classroom.

57. On or about January 13, 2021, Ms. Bennett notified Plaintiffs through email that she would no longer be providing tutorial sessions to A.G.

58. On or about January 15, 2021, Special Education Director Rana Mitchel wrote a letter to Plaintiffs requesting them to invite A.G.'s treating physician to school so they could consider his letters. Defendant sent a separate invitation to A.G. to attend.

59. On or about January 20, 2021, A.G. wrote on a paper, "I hate when you take my walker." The teacher moved A.G.'s clip down from green to yellow, which indicated a downward

grade of her behavior. Although A.G. uses a walker to provide her balance and movement due to her mobility impairment and recent surgery, the teacher made A.G. stand for five (5) minutes at recess as punishment for her self-advocacy. Defendant told A.G. she could not keep her walker in the classroom because the Defendants are concerned that non-disabled students could trip over her walker and fall. Defendant did not tell A.G. it was concerned with A.G.'s safety as a child with cerebral palsy, after a bilateral hip surgery, falling and getting hurt.

60. On or about January 20, 2021, Assistant Principal Nikita Smith told A.G. she could not sit on her walker seat. The seat is designed for A.G. to sit when she is tired.

61. On or about January 21, 2021, Emily requested another letter from A.G.'s treating physician Dr. Warner.

62. On or about January 21, 2021, Assistant Principal Stacey Johnson pulled A.G. from computer class, telling her she could not follow her mother's directions as to the walker at school and must follow the "school rules" regarding her walker during this school year.

63. On or about January 21, 2021, Emily received an email message from Mr. Johnson, in which he referred to a discussion that he had had with A. G. earlier that day, informing her that it was a "school rule" that she could not use her walker in the classroom.

64. On a different date during this same time period, Mr. Johnson hit A.G.'s walker with a clipboard and kicked the wheel while A.G. was using the walker. It appeared Mr. Johnson was amused, along with the other teachers, who laughed as they witnessed the incidents. A.G. did not find it amusing.

65. On or about January 22, 2021, A.G. stayed at home because of anxiety caused by Mr. Johnson and Defendant staff harassing her. Emily wrote an email with excuse explaining A.G.'s absence.

66. On or about January 26, 2021, A.G.'s treating physician Dr. Warner sent a third letter to Defendant stating A.G. must have immediate access to her walker at all times, and the decision to come off the walker is to be left up to A.G. and her parents.

67. On or about January 27, 2021, A.G. told Plaintiffs sometimes when there is toilet paper on the floor in the restroom, Ms. Bennett tells her to pick it up.

68. On or about January 28, 2021, Ms. Bennett told A.G. she could not sit on her walker on the playground and told A.G she could stand up or sit at the picnic table. Sitting at the picnic table would separate A.G. from her peers. Emily wrote an email to Ms. Bennett explaining that the walker has a seat and locking brakes, which A.G. can use when she is tired. The playground has a gravel surface, which is not recommended for a person with mobility issues, but A.G. manages to access the playground with her walker. However, she is not allowed to access the slide, though the staff has observed on multiple occasions A.G. using the slide with the help of her therapist.

69. On or about January 29, 2021, A.G. tripped over an object and fell during physical therapy at the school. She hit her head on a metal object attached to the wall. A.G. was taken to the nurse, but Defendant did not notify Plaintiffs of the incident for about three hours.

70. On or about February 4, 2021, A.G. fell again in physical therapy at the school and hit her buttocks. Nikita Smith called the mother to pick her up, but because A.G. was not complaining and had missed so much instruction already, Emily decided to leave her at school.

71.     On or about February 4, 2021, after A.G. fell on her buttocks, teacher Ms. Hill moved
        A.G.'s clip down from green to yellow because A.G. did not have her signed papers and
        made A.G. stand at recess as punishment.

72.     On or about February 5, 2021, Emily wrote an email to the teacher asking her not to punish
        A.G. by making her stand and reminded her that the walker had wheels that locked in place
        so A.G. could use the seat.

73.     On or about February 24, 2021, A.G. was about to eat her snack before leaving school
        when Ms. Bennett told A.G. it was time to get on the special education bus. A.G. did not
        get to eat her snack because the bus came early. A.G.'s nondisabled peers were just
        beginning to eat their snacks.

74.     On or about March 3, 2021, through a phone call, Assistant Principal, Nikita Smith, notified
        Emily that she, Ms. Smith, would be the "point of contact" between Plaintiffs and the
        school staff. Nikita Smith directed Emily to communicate only through Ms. Smith. Direct
        communication with providers of educational services has been customary in the past, and
        other parents are allowed and encouraged in the Winona Montgomery Consolidated School
        District to communicate with appropriate teachers regarding their children's educational
        concerns.

## COUNT I: DISCRIMINATION BASED ON DISABILITY PURSUANT TO SECTION 504 OF THE REHABILITATION ACT OF 1973

75.     Plaintiffs reincorporate and reiterate paragraphs 1 through 74.

76.     Section 504 of the Rehabilitation Act of 1973 and its implementing regulations provide,
        "no otherwise qualified individual with a disability in the United States… shall, solely by
        reason of her or his disability, be excluded from participation in, be denied the benefits of,

or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

77.  Among other requirements, entities subject to Section 504 must provide equal opportunity to qualified persons with disabilities to participate or benefit from any aid, benefit, or service they make available. 34 C.F.R. § 104.4(b)(1)(ii).

78.  Entities subject to Section 504 must avoid otherwise limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service. 34 C.F.R. § 104.4(b)(1)(vii).

79.  An individual with a disability is defined by reference to the ADA. 29 U.S.C.§ 705(20(B) (referencing 42 U.S.C. § 12102(1)).  A person has a disability under Section 504 if they have a physical or mental impairment that substantially limits one or more of their major life activities.  42 U.S.C. § 12102(1).

80.  Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. A major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. 42 U.S.C. §§ 12102(2)(A) and (B).

81.  A "qualified individual with a disability" is one who, with or without reasonable accommodations for their disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of a recipient of Federal financial assistance. 29 U.S.C. § 794(a).

82. A "program or activity" includes local education agencies, public boards of education and school systems. 29 U.S.C. § 794 (b)(2)(B) (referencing 20 U.S.C. § 7801 (26)).

83. A "recipient of Federal financial assistance" is a public or private agency or other entity to which Federal financial assistance is extended directly or through another recipient. 34 C.F.R. § 104.3(f).

84. A. G. is an individual with physical and mental impairments, including but not limited to, cerebral palsy, Anxiety, Mood Disorder and ADHD.

85. A. G.'s. impairments affect her major life activities of caring for herself, balancing, and walking. She also struggles with intense anxiety, concentration, and attention problems.

86. Accordingly, A. G. is an individual with disabilities as defined by Section 504. A.G. is an otherwise qualified individual with disabilities who meets essential eligibility requirements to receive services from or participate in the programs or activities of Defendant.

87. A.G. attends and receives educational services from WMCSD.

88. The education of students by the WMCSD is a program or activity subject to Section 504.

89. WMCSD is a recipient of Federal financial assistance.

90. Defendant is subject to the non-discrimination provisions of Section 504.

91. Defendant's failure to remove architectural barriers, failure to allow A.G. to fully and freely use a walker for mobility, implementation of the tactics of intimidation and exclusionary conduct of Defendant's staff and teachers, among other actions, discriminated against A. G. as a person with disability by denying her equal access and otherwise limiting her access to Defendant's facilities, programs and services as compared to her nondisabled peers.

92. Defendant's refusal to remove architectural barriers and its implementation of

discriminatory policies and practices toward A.G. is illegal disability-based discrimination that violates Section 504 of the Rehabilitation Act of 1973.

93.     Defendant's discrimination was intentional as Defendant refused to remove architectural barriers in the restrooms, parking and sidewalks despite its knowledge that A. G. was a qualified person with a disability who had trouble walking on the inaccessible sidewalks and parking lot, and prohibited her from fully and freely using her walker in the restrooms, and was a violation of equal access for A. G.

94.     Defendant's discrimination was intentional because despite letters from doctors, requests from Plaintiffs and from A.G., Defendant continued to take A.G.'s walker away from her in the classroom.

95.     Defendant's discrimination was intentional because despite repeated requests to adjust the bus schedule so that A. G. could maintain the same bus schedule as her non-disabled peers and not miss activities at the beginning and the end of the school day, Defendant refused to alter the bus schedule. In addition, Defendant threatened Plaintiffs with criminal legal action.

96.     As a proximate result of these violations of Section 504, A. G. has suffered harm as set forth above.

97.     Because A.G. will continue receiving education and related services at WMCSD, she will face discrimination and retaliation again from Defendant.

98.     Pursuant to 28 U.S.C. § 794(a), among other statutes, this Court is authorized to award attorneys' fees to the Plaintiffs based on these illegal actions by Defendant.

**WHEREFORE**, Plaintiffs respectfully request this Honorable Court to grant the following relief:

(1) to enter a declaratory judgment pursuant to Fed. R. Civ. P. 57, stating that Defendant's

denial of reasonable accommodations has subjected A.G. to discrimination in violation of Section 504;

(2) to permanently enjoin Defendant, its board members, directors, its successors, staff, employees and any and all Defendant's agents from its discriminatory practices and procedures against A.G. based on her disability denying her equal participation in the Defendant's programs and activities, including:

(a) A.G. being integrated into playground activities and not being segregated by requiring her to sit at the picnic table instead of on the playground and using playground equipment with or without accommodations;

(b) A.G. not being punished for requesting her walker;

(c) A.G. not being rewarded for not using her walker;

(d) A.G. getting timely special education bus transportation to and from the school like other students so that she can have equal access to meals, snacks and other activities at the beginning and end of the school day;

(e) Defendant remediating its restrooms, so at least one is accessible to A.G. and similarly situated students with disabilities;

(f) Defendant repairing its parking and sidewalks, so A.G. and similarly situated students with disabilities are able to access the pick-up and drop-off points used by other car riding students on the shortest accessible route to the entrance.

(g) Defendant designating and implementing policies, practices and procedures on enforcing the handicapped restricted parking spaces;

(3) to award Plaintiffs compensatory damages;

(4) to develop a clear policy, practice and procedure as it relates to students with mobility

issues;

      (5) to award Plaintiffs reasonable attorneys' fees and costs;

      (6) to grant Plaintiffs other relief this Court deems just and proper.

## COUNT II: DISCRIMINATION BASED ON DISABILITY PURSUANT TO TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF 1990

99.     Plaintiffs reincorporate and reiterate paragraphs 1 through 74.

100.    Title II of the ADA and its implementing regulations forbid public entities, including local education agencies, to exclude or deny people with disabilities, like A.G., the benefits of its services, programs or activities, or to discriminate based on disability. 42 U.S.C. § 12132; 28 C.F.R. §§ 35.104 and 35.130(a).

101.    Prohibited disability-based discrimination by public entities includes the failure to provide qualified individuals with disabilities an equal opportunity to participate in or benefit from aids, benefits or services or "otherwise limit" a qualified individual with a disability in the enjoyment of any right, privilege, aid, benefit, or service. 28 C.F.R. §§ 35.130(b)(1)(ii) and (vii). Prohibited disability discrimination additionally includes the failure to make reasonable policy modifications as necessary to avoid discrimination against an individual based on their disability. 28 C.F.R. § 35.130(b)(7).

102.    An "individual with a disability" is one who has a physical or mental impairment that substantially limits one or more of their major life activities. 42 U.S.C. § 12102(1).

103.    Major life activities include, but are not limited to, caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, and working. 42 U.S.C. § 12102(2)(A). Major life activities also include the operation of major bodily function. 42 U.S.C. § 12102(2)(B).

104. A "qualified individual with a disability," is one who, with or without reasonable accommodations for her disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of the public entity. 42 U.S.C. § 12131(2).

105. A.G. is a child with cerebral palsy, Anxiety and Mood Instability Disorder, and ADHD.

106. A. G.'s impaired physical status affects her major life activities, including mobility.

107. A. G. is an otherwise qualified person with disabilities who meets the essential eligibility requirements to receive services from or participate in the programs or activities of WMCSD.

108. Defendant's failure to remove architectural barriers, failure to allow her to fully and freely use a walker for mobility in classroom and in the restroom, intentional intimidation and exclusionary conduct of Defendant's staff and teachers, among other actions, discriminated against A.G. as a person with disabilities by denying her equal access and otherwise limiting her access to WMCSD's facilities, programs and services as compared to her non-disabled peers. 28 C.F.R. §§ 35.130(a), 35.130(b)(1)(ii), and (vii)

109. Defendant illegally discriminated against A. G. in its continuing refusal to reasonably accommodate A.G. as a person with a disability.

110. Defendant's refusal to remove architectural barriers and its implementation of discriminatory policies and practices toward A.G. was illegal disability-based discrimination that violated Title II of the ADA.

111. Defendant refused to remove architectural barriers despite its knowledge that A. G. was not able to safely and conveniently use the restroom with or without her walker. Defendant knew that A.G. was a qualified person with a disability, nevertheless prohibited her from

fully and freely using her walker, which was a violation of equal access for A.G.

112.    Defendant refused to alter the special education bus schedule, knowing that A.G. leaves her classes at least twenty (20) minutes earlier than the end of the class, missing instruction, while all the other nondisabled peers stay till the end of the class.

113.    Defendant continues to maintain inaccessible parking and sidewalks, where it is impossible for A.G. to access covered sidewalks and to be picked up by her parents in the car rider line at the same time and using the same procedures as non-disabled peers.

114.    Defendant segregates A. G. on the playground by requiring her to sit at the picnic tables instead of integrating her into playground activities and allowing her to use playground equipment such as the slide with or without accommodations.

115.    As a proximate result of these violations of Title II of the ADA, A. G. has suffered harm as set forth above.

116.    To date, the Defendant's discriminating actions continue, and A.G. suffers harm because of these actions. Architectural barriers remain at the facility and Defendant's staff and teachers continue to treat A. G. differently because she uses a walker.

117.    Pursuant to 42 U.S.C. § 12133, among other statutes, this Court is authorized to award attorneys' fees to the Plaintiffs based on these illegal actions by Defendant.

**WHEREFORE**, premises considered, A.G., by and through her parents Emily and Jason, demands judgment against the Defendant on all counts and requests the following award of relief, including injunctive and declaratory relief:

**(1)**    That the Court enter judgment in A.G.'s favor against the Defendant;

**(2)**    That the Court enter a declaration that Defendant violated A.G.'s rights under Title II of the ADA;

**(3)**     That the Court award reasonable attorneys' fees pursuant to Title II of the ADA;

**(4)**     That the Court enter an Order directing Defendant to remove architectural barriers by repairing, providing and maintaining accessible restrooms, playground, parking and sidewalks pursuant to the ADA so A.G. and other similarly situated individuals are able to access the primary school entrance and walk to class with nondisabled peers.

**(5)**     That the Court enter an Order directing Defendant to evaluate and neutralize its policies, practices, and procedures towards persons with disabilities for such reasonable time so as to allow them to undertake and complete corrective procedures;

**(6)**     That the Court award such other, further, and different relief as it deems necessary, just, and proper.

### COUNT III: RETALIATION PURSUANT TO SECTION 504 OF THE REHABILITATION ACT OF 1973

118.    Plaintiffs reallege and reiterate paragraphs 1 through 74.

119.    Section 504 of the RA incorporates the antidiscrimination provisions of Title VI of the Civil Rights Act of 1964, which "prohibits recipients of Federal financial funds from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege … or because he has made complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part." 34 C.F.R. §§ 104.61 and 100.7(e).

120.    After September 12, 2020, when Defendant learned that an OCR complaint had been filed by E. G. and J. G., there was a noticeable change in Defendant's behavior toward A. G. For example, in unilaterally denying A.G. the use of her walker in the restrooms; forcing A.G. to leave her walker outside the classroom, denying her freedom of movement in the

classroom; punishing A.G. for forgetting signed papers by forcing her to stand, as well as by devising a sticker and clip reward system as related to her walker; punishing A.G. for self-advocacy through the clip reward system and by forcing her to stand; by canceling supplemental assignments and tutoring lessons; by requesting A.G.'s doctor's personal presence at school to consider his written letters; by expressing demeaning attitude toward Plaintiffs regarding physical therapy sessions; by sending a letter threatening Jason with criminal legal action for approaching the bus to help A.G. with wheelchair management and to talk to the bus driver about the disparate bus schedule; by sending A.G. home not to "deal" with her under pretenses she was sick, when she wasn't sick; by bus driver leaving A.G. alone and not properly situated at the end of the driveway; by constantly asking A.G. and in the presence of her peers if she wanted to use the restroom without the walker; by disallowing A.G. to sit on her walker; by kicking her walker, laughing at her and her walker, and by intimidating her and telling her she had to follow the school rules instead of her mother's wishes and other similar behaviors; and by establishing a policy that Nikita Smith should be the only "point of contact" of Plaintiffs with the school, and, thereby, discouraging customary direct parental communication with A.G.'s teachers and staff.

121. As stated above, Plaintiffs requested multiple times that A.G.'s rights to a walker, to a wheelchair, to the accessible restrooms, playground, parking and sidewalks, as A.G. is an individual with disabilities and is entitled to use her mobility devices, to have a bus pick-up and drop-off schedule that affords her a school schedule equal to that of non-disabled peers, etc.

122. Defendant chose to ignore those requests, instead unilaterally changing the mobility aid of A.G. from a wheelchair to a walker contradicting her doctors' advice, taking away A.G.'s

walker in classroom and in the restrooms contradicting her doctors' advice, retaliating against A.G. by asking her to pick up someone else's toilet paper in the restroom, threatening Plaintiffs with criminal legal action when Jason approached the bus to assist A.G. with wheelchair management and to speak to the driver, sending A.G. home not to deal with her and her walker under the pretenses that she was sick, punishing her for requesting her walker, denying her access to the slide during recess, ceasing supplemental instruction through iReady immediately after the OCR complaint was filed, and ceasing tutoring after Emily confronted Ms. Bennett about the harassment regarding A.G.'s walker use in the restroom, as well as restricting Plaintiff's free and open communication with teachers and staff by appointing Nikita Smith as the "point of contact" for the Defendant.

123.    Defendant intentionally chose a pattern of intimidation and interference once Plaintiffs started requesting the removal of architectural barriers in the restrooms, parking, sidewalks, ramps and insisting on a comparable bus schedule for A.G. A.G. was humiliated by Assistant Principal Stacey Johnson when he kicked and hit her walker and laughed at her, as other staff joined in. A.G. was humiliated and discriminated against because she was punished in the classroom and on the playground by forcing her to stand, when the teachers knew she had difficulty balancing, standing and walking due to a mobility impairment. Defendant threatened Plaintiffs with criminal legal action after Jason approached the bus to ensure A.G. boarded the bus safely and to discuss the bus schedule with the driver.

**WHEREFORE**, premises considered, A.G., by and through her parents Emily and Jason, demands judgment against the Defendant and requests the following award of relief, including injunctive and declaratory relief:

**(1)**    That the Court enter judgment in A.G.'s favor against the Defendant;

**(2)**     That the Court enter a declaration that Defendant retaliated against A.G. pursuant to Section 504;

**(3)**     That the Court award Plaintiffs damages;

**(4)**     That the Court award Plaintiffs reasonable attorneys' fees pursuant to Section 504;

**(5)**     That the Court enter an Order enjoining Defendant from its retaliatory conduct now and in the future;

**(6)**     That the Court enter an Order directing Defendant to evaluate and neutralize its policies, practices, and procedures towards persons with disabilities for such reasonable time, so as to allow them to undertake and complete corrective procedures;

**(7)**     That the Court award such other, further, and different relief as it deems necessary, just, and proper.

### COUNT IV: RETALIATION BASED ON DISABILITY PURSUANT TO TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF 1990

124.     Plaintiffs reallege and reincorporate paragraphs 1 through 74.

125.     Non-disabled individuals who have "opposed any act or practice made unlawful" by Title II of the ADA have standing to sue under the anti-discrimination provisions of the ADA. *Barker v. Riverside Cty. Office of Educ.*, 584 F. 3d 821, 827 (9 Cir. 2009).

126.     After October 27, 2020, when Defendant learned that an OCR complaint had been filed by E. G. and J. G., there was a noticeable change in Defendant's behavior toward Plaintiffs. For example, by sending a letter threatening Jason with criminal legal action for approaching the bus to assist A.G. and to speak to the bus driver about the disparate special education bus schedule; by sending A.G. home not to "deal" with her under pretenses she was sick, when she wasn't sick; by intimidating Emily and sending her an email message

regarding the "school rules" as described above; by ignoring Plaintiffs' requests for reasonable accommodations for A.G.

127. Defendant chose to ignore those requests, instead unilaterally changing the mobility aid of A.G. from a wheelchair to a walker contradicting her doctors' advice and Plaintiffs' requests, taking away A.G.'s walker in classroom and in the restrooms contradicting her doctors' advice and Plaintiffs' requests, threatening Plaintiffs with criminal legal action when Jason approached the bus to assist A.G. and to speak to the bus driver regarding the schedule, sending A.G. home for Plaintiffs to take care of her and to educate her instead of Defendant.

128. Defendant intentionally chose a pattern of intimidation and interference once Plaintiffs filed the OCR complaint requesting the reasonable accommodation of accessible restrooms, parking, sidewalks, A.G. using her wheelchair and then a walker, by threatening Plaintiffs with criminal legal action after Jason approached the bus to help A.G. and to speak to the bus driver.

**WHEREFORE**, premises considered, Plaintiffs Emily and Jason, demand judgment against the Defendant and requests the following award of relief, including injunctive and declaratory relief:

**(1)** That the Court enter judgment in A.G.'s favor against the Defendant;

**(2)** That the Court enter a declaration that Defendant retaliated against Plaintiffs pursuant to the ADA;

**(3)** That the Court award reasonable attorneys' fees pursuant to 42 U.S.C. §§ 12203 and 12133;

**(4)** That the Court enter an Order enjoining Defendant from its retaliatory conduct now and in the future;

**(5)**     That the Court enter an Order directing Defendant to evaluate and neutralize its policies, practices, and procedures towards persons with disabilities for such reasonable time so as to allow them to undertake and complete corrective procedures;

**(6)**     That the Court award such other, further, and different relief as it deems necessary, just, and proper.

Respectfully Submitted, this the 12th day of March, 2021.

> */s/ Pshon Barrett*
> PSHON BARRETT (MSB #2071)
> *Attorney for Plaintiffs*
> 4001 Carmichael Road, Suite 570
> Montgomery, AL  36106
> Telephone:  334-323-0029
> Fax:  334-521-3859
> E-Mail:  Pshon.Barrett@ada-firm.com